**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    CRIMINAL ACTION NO. 1:09-cr-00270

THOMAS CREIGHTON SHRADER,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed Defendant's Second Motion to Suppress [Docket 62]. In his motion, Defendant requests that the Court suppress any and all items seized from Defendant's residence in Duhring, West Virginia. After careful consideration of the briefing on this motion, and the evidence and arguments presented in the June 15, 2010, hearing in this case, the Court denies Defendant's motion in part, and grants the same in part.

*I. BACKGROUND*

Defendant was arrested on November 13, 2009, by federal and local law enforcement officials at his Duhring, West Virginia home. Defendant was cooperative during his arrest, but when Defendant was asked to consent to a search of his home, he replied that law enforcement would need to obtain a search warrant. Upon further questioning, Defendant also stated that there were firearms present in the house. Some of the officers present then proceeded to take Defendant away, while Federal Bureau of Investigation ("FBI") Special Agent Terry Schwartz remained with a few other agents at the end of the house driveway to wait for Ms. Elizabeth Jones, the eighty-five year old

woman who lives with Defendant and who has alternatingly been described to the Court as his aunt and/or adopted sister, to return home from running errands.

Ms. Jones returned home approximately two hours later.  At the June 15, 2010, hearing in this case, Special Agent Schwartz testified that "we went up to her and just introduced oursel[ves] like we normally do with most people we deal with on the street, and advised her who we were and wanted to talk to her about . . . her brother . . . . [S]he agreed to speak with us . . . . Then she proceeded to, was very nice, very cordial, invited us into her house, told us to sit down at the [kitchen] table."  (Docket 150 at 30).  Ms. Jones, who at the time had recently undergone heart surgery, remembers this encounter differently.  She testified that Special Agent Schwartz approached her in the driveway, informed her that Defendant had been arrested, followed her into her house without invitation, only identified himself after ten to fifteen minutes of conversation, and that he had insisted on sitting in the kitchen after she offered him a seat elsewhere.  She also testified that she had been nervous and intimidated throughout her encounter with Special Agent Schwartz.

Special Agent Schwartz asked Ms. Jones if she knew where the guns were, and she replied in the affirmative.  When Special Agent Schwartz asked her if he and his colleagues could have the guns, Ms. Jones testified as to the following colloquy "'[she replied] Well, what happens if I don't let you have them?' [Special Agent Schwartz] says, 'We get a search warrant.'  I said -- I didn't want my house tumbled up, so I said, 'You may have them.'"  *Id.* at 86; *see also id.* at 94.  Although she testified that she did not consent to a search of Defendant's truck, and does not remember signing a consent form, Ms. Jones signed a form consenting to searches of the home and of Defendant's truck, the latter being titled and/or registered in her name.  When Ms. Jones was shown the consent form at the June 15, 2010, hearing, however, she confirmed that "[y]es, that's my

2

signature." *Id.* at 87; *see also id.* at 94. Along with the guns found in the house, law enforcement seized from the truck two copies of the letter that Defendant allegedly sent to the victim in this case, "DS."[1]

Law enforcement also seized a computer from Defendant's office. Ms. Jones stated that she keeps no belongings in Defendant's office, and, when asked if she ever used the computer, she replied that she's "never in there unless [Defendant] calls me, you know, for something." *Id.* at 91. When asked at the hearing by counsel for the United States whether "[the office door] was open; correct? You didn't have to go get a lock to unlock that door," Ms. Jones replied "[n]o, huh-uh." *Id.* at 95. On cross examination, Special Agent Schwartz had the following colloquy with counsel for Defendant regarding the office:

> Special Agent Schwartz: . . . . And I think that little office was to the left of the living room. I believe it was.
> Defense Counsel: And did Ms. Jones indicate to you that this was [Defendant's] office?
> Special Agent Schwartz: Right, she did.
> Defense Counsel: And that the computer and the other, other items in that office belonged to him?
> Special Agent Schwartz: Yes, she did.
> Defense Counsel: Okay. So, it would be, it would be inaccurate to testify as you did earlier that this was a common area.
> Special Agent Schwartz: I don't know. I guess common to the folks that live in that house. I mean, --
> Defense Counsel: But it was [Defendant's] computer?
> Special Agent Schwartz: It was his belongings in that room, yes.

---

[1] In two counts of the three count Second Superseding Indictment filed in this case, Defendant is charged with violating 18 U.S.C. § 2261A(2) by stalking DS and her husband, RS, by use of interstate facility. Count Three of the Second Superseding Indictment charges Defendant with felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). See *United States v. Shrader*, Case No. 1:09-cr-00270, 2010 U.S. Dist. Lexis 10820, 2010 Westlaw 503092 (S.D. W. Va. February 08, 2010) (Docket 42) for further details as to the factual background and allegations of this criminal action.

>Defense Counsel: And Ms. Jones characterized it as [Defendant's] office; correct? That's what you testified to.
>Special Agent Schwartz: Something along -- yes, she did, yeah.

*Id.* at 47.  On redirect examination, Special Agent Schwartz further testified that the door to the office was open and unlocked.

## II. APPLICABLE LAW

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV.  The exceptions to this rule "have been jealously and carefully drawn," *Jones v. United States*, 357 U.S. 493, 499 (1958), and include searches where voluntary consent is given by a fellow occupant who shares common authority over property when the suspect is absent, *United States v. Matlock*, 415 U.S. 164, 171 (1974), and entries and searches made with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant, *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).  Common authority is not implied from a property interest, "but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 172 n.7.

A search is unconstitutional, however, if a physically present co-occupant refuses to consent to a search and law enforcement then obtains consent from an also present co-occupant.  *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).  "[C]onsent to search can be implied from a person's words, gestures, or conduct . . . .  In determining whether consent to search was freely and voluntarily given, the factfinder must examine the totality of the circumstances surrounding the consent." *United*

*States v. Moreland*, 437 F. 3d 424, 429 (4th Cir. 2006) (internal citations omitted).  The United States bears the burden of proving by a preponderance of the evidence that consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973).  Further, when law enforcement has acted illegally, a court must determine "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

### *III. ARGUMENT*

Defendant argues that the guns and other items seized from Defendant's house should be suppressed.  He argues that Ms. Jones consent "was tainted by his initial intrusion into the home without her permission."  (Docket 62 at 3).  At the June 15, 2010, hearing, counsel for Defendant further argued that the government acted in contravention of *Georgia v. Randolph*, 547 U.S. at 121, by removing Defendant from the scene in order to prevent him from objecting to the search in the physical presence of Ms. Jones.

The United States disagrees, arguing that Ms. Jones validly consented, as she had invited the agents into her home and that "[a]t no time did the FBI agents forcibly enter the home nor did Ms. Jones instruct the agents not to follow her in the home for the interview."  (Docket 72 at 4). Moreover, the United States argues that even if Special Agent Schwartz unlawfully entered into Ms. Jones' home, the seized evidence was obtained by means sufficiently distinguishable from the unlawful entry, namely, her consent.

5

### IV. DISCUSSION

*A. Ms. Jones' Consent*

At the June 15, 2010, hearing, the Court observed the testimony of both Special Agent Schwartz and Ms. Jones and assessed their credibility and demeanor. Upon consideration of the totality of the circumstances, the Court finds that Ms. Jones' consent to the search was voluntary and valid. Several times throughout the June 15, 2010, hearing, Ms. Jones referred to the residence in question as "my house." (Docket 150 at 86 and 94). Ms. Jones, therefore, had actual or apparent authority to consent to the search. Moreover, her testimony revealed that she went through a deliberative process in determining whether to consent to the search; she ultimately consented after deciding that she didn't want her house "tumbled up." *Id.* at 86; *see also id.* at 94. This deliberative process shows that Ms. Jones was capable of making an informed and valid decision to consent, despite her claims that she had been bullied by Special Agent Schwartz and was nervous and intimidated. Moreover, at a minimum, Ms. Jones never requested that the agents not enter her house, and she did not order them to leave. In fact, she testified that "it never entered my mind to ask them to leave." *Id.* at 92. Based on Special Agent Schwartz's testimony, Ms. Jones may have invited him into her home as well. Moreover, Ms. Jones' statement that she did not remember signing the consent form is belied by her testimony regarding her deliberative process. Further, the Court finds that Ms. Jones readily admitted that it was, in fact, her signature on the consent form. As noted earlier, when Ms. Jones was shown the consent form at the June 15, 2010, hearing, she confirmed that "[y]es, that's my signature." *Id.* at 87; *see also id.* at 94.

*B. The Seized Firearms and Letters*

As the firearms seized by law enforcement were located in a common area of the house, the Court finds that Ms. Jones had the authority to consent to their seizure. At the June 15, 2010, hearing, moreover, Special Agent Schwartz testified that on the date in question, Ms. Jones explained to him that the firearms "were passed down from her mother and father. They were in her family with her mother and father for a long, for the longest time. And then when they passed on . . . she just took possession of those weapons." *Id.* at 31. Ms. Jones therefore consented to the seizure of property that she indicated was hers.[2]

Further, while Ms. Jones testified that she did not consent to a search of a vehicle, the truck was listed on the consent form that she signed. Since the truck was titled and/or registered in her name, Special Agent Schwartz and his colleagues had a reasonable expectation that she could consent to a search of the truck, and the Court finds that the seizure of the letters was therefore appropriate.

*C. Defendant's Computer*

The Court finds that the United States has not met its burden of proof as to Defendant's computer, and any other items seized from Defendant's office. Ms. Jones testified that she did not keep any belongings in Defendant's office, and that she never enters the office unless Defendant requests her presence. Special Agent Schwartz also testified that Ms. Jones had informed him that the computer and other items in the office belonged to Defendant, and that Ms. Jones had characterized the room as Defendant's office. The Court notes that when counsel for the United

---

[2] The Court emphasizes that it makes no finding as to whether the firearms were in the possession of Defendant.

States asked Ms. Jones whether "[the office door] was open; correct?  You didn't have to go get a lock to unlock that door," and Ms. Jones replied "[n]o, huh-uh," the United States did not let Ms. Jones answer the first question before moving on to the second one.  Therefore, it is unclear whether she was answering in the negative as to whether the office door was kept open or whether it was locked up, although the Court notes Special Agent Schwartz's testimony that the door was both open and unlocked.

Upon review of the evidence in this matter, the Court finds that the United States has not proved that Ms. Jones had common authority over Defendant's office.  Therefore, Ms. Jones could not give legally sufficient voluntary consent to the search of Defendant's office.  *Matlock*, 415 U.S. at 177.  Further, the Court finds that Special Agent Schwartz could not have reasonably, but erroneously, believed that Ms. Jones possessed shared authority as an occupant to consent to a search of the office.  As it relates to the Defendant's office, the facts available did not "'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 186-89 (internal citation omitted).  The Court orders Defendant's computer, and any other items seized from Defendant's office, suppressed.

*D. Defendant's* Randolph *Argument*

Finally, the Court finds no merit to Defendant's *Randolph* argument.  Six FBI agents, the Mercer County Sheriff and his chief deputy, and a Deputy United States Marshall participated in Defendant's arrest.  There is no evidence to suggest that their intent was to extraordinarily render Defendant away from the scene to violate his Fourth Amendment rights.  Rather, the evidence is clear that the only plan that day was to arrest Defendant, particularly in light of the evidence that

Special Agent Schwartz and the other agents did not even know about the firearms until they were informed of them by the Defendant upon his being arrested.

*V. CONCLUSION*

For the reasons stated herein, the Court **ORDERS** Defendant's Second Motion to Suppress [Docket 62] **DENIED** in part and **GRANTED** in part.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, and the United States Attorney.

ENTER: June 23, 2010

_____
IRENE C. BERGER, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA