UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION

UNITED STATES OF AMERICA

v.     Criminal Action No. 1:09-00270

THOMAS CREIGHTON SHRADER

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant, Thomas Creighton Shrader, by his counsel, Assistant Federal Public Defender Christian M. Capece, respectfully submits this Memorandum for consideration by this Honorable Court for his November 18, 2010 sentencing hearing.

A.   **Legal Objections**:

   I.   **General Objection**

Mr. Shrader objects to paragraphs 8 through 15 as being part of the offense conduct. Defense counsel previously moved the Court (in pretrial motions and during trial) to hold that the offense conduct in Counts One and Two should be limited to Mr. Shrader's mailing of the 32-page letter (the "Letter") to DS on or about October 26, 2009. Mr. Shrader respectfully maintains that the history and other allegations set forth in paragraphs 8 through 15 are not part of the offense conduct.

   II.   **Objections to Guidelines Calculation**

**Paragraphs 25, 31, 33 & 39 –**

Mr. Shrader respectfully objects to the recommendation that he receive a two-level increase under U.S.S.G. § 2A6.2(b)(1)(D). Applying this enhancement in this case would amount to double-counting.

U.S.S.G. § 2A6.2(b)(1)(D) applies when the offense involved "a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim." Application Note 1 defines "pattern of activity" as "any combination of two or more separate instances of stalking, threatening, harassing, or

assaulting the same victim." U.S.S.G. § 2A6.2, comment. (n.1). This enhancement applies regardless of whether the conduct that is part of the "pattern of activity" results in a conviction. Id. Application Note 3 states that "the court shall consider, under the totality of the circumstances, any conduct that occurred prior to or during the offense." U.S.S.G. § 2A6.2, comment. (n.3).

The jury convicted Mr. Shrader of engaging in a course of conduct with the intent to harass, intimidate and cause substantial emotional distress or place the victims in reasonable fear of serious bodily injury or death. "Course of conduct" is defined as "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). The Government argued, and the Court agreed (over defense counsel's objections), that the jury could consider all of Mr. Shrader's interactions with the victims dating back to 1975 as together constituting the "course of conduct" necessary to find him guilty of violating § 2261A(2). As a result of this Court's ruling, these collective actions constituted a single violation of the offense of Stalking by Use of an Interstate Facility against each victim. It is unfair and improper to now find that one or more of the acts that the jury found constituted the whole of each § 2261A(2) offense may now also be counted as separate incidents of stalking, threatening, harassing or assaulting, thereby triggering this enhancement.

Without this enhancement, Mr. Shrader's base offense level for his § 2261A(2) convictions is reduced from 20 to 18.

**Paragraph 40 –**

Mr. Shrader objects to the Probation Officer's revised guidelines range recommendation that he qualifies as an Armed Career Criminal under 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4. Neither the Probation Officer nor the Government in its objection letter offered any proof in the way of documents approved by the Supreme Court in *Shepard v. United States*, 544 U.S. 13, 16 (2005), establishing that Mr. Shrader's prior felony convictions for murder and unlawful wounding took place on separate occasions for the purposes of establishing the requisite convictions under § 924(e).

The Government bears the burden of demonstrating the requirements in order to increase a defendant's base offense level. *United States v. Abdi*, 342 F.3d 313, 317 (4th Cir. 2004), *cert. denied,* 540 U.S. 1167 (2004). Defendants qualify for the harsh sentencing enhancement under § 924(e) and U.S.S.G. § 4B1.4 if they (1) have three or more prior convictions; (2) for either a violent felony or controlled substance offense (as those crimes are defined by 18 U.S.C. Sects. 924(e)(2)(A) and (B)); and (3) that were "committed on occasions that were different from one another." 18 U.S.C. § 924(e)(1). "Convictions will be considered as having occurred on occasions different from one another under the [ACCA] if each arose out of a separate and distinct criminal episode." *United States v. Hobbs*, 136 F.3d 384, 388 (4th Cir. 1998), *cert. denied*, 118 S. Ct. 2358 (1998). The Fourth Circuit considers the following factors when determining whether offenses occurred on separate occasions:

> (1) whether the offenses arose in different geographic locations; (2) whether the nature of each offense was substantively different; (3) whether each offense involved different victims; (4) whether each offense involved different criminal objectives; and (5) after the defendant committed the first-in-time offense, did the defendant have the opportunity to make a conscious and knowing decision to engage in the next-in-time offense.

*United States v. Leeson*, 453 F.3d 631, 640 (4th Cir. 2006).

Importantly, courts are limited to "examining the statutory definition, charging document, written plea agreement, transcript of a plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented," in order to determine whether a prior offense is counted as a separate criminal episode under § 924(e). *Shepard v. United States*, 544 U.S. 13, 16 (2005)*; United States v. Tucker*, 603 F.3d 260, 266 (4th Cir. 2010). Sentencing courts are limited to these documents for two reasons – to avoid collateral trials and a wider inquiry that could violate a defendant's Sixth Amendment right to a trial by jury. *United States v. Alston*, 611 F.3d 219, 225-226 (4th Cir. 2010)(citing *United States v. Dean*, 604 F.3d 169 172, 175 (4th Cir. 2010)).

The Probation Officer and Government counsel failed to cite or proffer any *Shepard*-approved documents as proof that Mr. Shrader's convictions for first degree murder and unlawful wounding

should be treated as having been "committed on occasions that were different from one another," and thus qualifying him as an Armed Career Criminal. Instead the Probation Officer and the Government rely generally on *United States v. Carr*, 592 F.3d 636 (4th Cir. 2010), *cert. denied,* 2010 U.S. LEXIS 5910 (Oct. 4, 2010). No analysis of this case accompanied the Government's objection letter. The Probation Officer opines that *Carr* supports application of the ACCA in this case because there were multiple victims of Mr. Shrader's crimes. That analysis is insufficient to trigger the application of § 924(e). That there were multiple victims is but one, and only one, factor that this Court must consider. See *Tucker*, supra. Moreover, the Probation Officer's analysis does not explain how the presence of multiple victims necessarily means that said victims were harmed from a separate and distinct criminal episode, the essential question when deciding whether the ACCA applies in a given case. See *United States v. Letterlough*, 63 U.S. 332, 335 (4th Cir. 1995)(emphasizing the importance of "defining each conviction as a separate event").

More importantly, the Government may not assert without explanation or proffer that a (significant) sentencing enhancement applies, and then wait for defense counsel to offer up proof that this Court should not enhance Mr. Shrader's sentence. The Government's failure to set forth its reasoning as to why it believes that Mr. Shrader qualifies as an Armed Career Criminal, as well as its failure to provide the Court with the *Shepard-* approved documents that support its position, is improper burden shifting. If the Government believes Mr. Shrader should suffer a 15-year mandatory minimum sentence, then Government counsel must do more than cite a single case, without analysis, to support its position.

Should this Court find that Mr. Shrader is ineligible to qualify as an Armed Career Criminal, Mr. Shrader's base offense level should be a 14. Mr. Shrader's previous convictions, and the period of imprisonment related to those convictions, expired more than 15 years before the commencement of the offenses charged in the Second Superceding Indictment. See U.S.S.G. § 2K2.1, comment.

(n.10)(requiring that courts count only those felony convictions that receive criminal history points under § 4A1.1(a)). Mr. Shrader's base offense level for this offense should be a 14, as he was a prohibited person at the time the jury found that he possessed the firearms. Mr. Shrader would also respectfully object to a four-level enhancement under U.S.S.G. § 2K2.1(b)(6) because the firearms involved in this offense were in no way connected to the felony convictions of Stalking by Use of an Interstate Facility, as recommended by the Probation Officer in the draft PSR. This conclusion is supported by the Court's own findings.

In February of 2010, the defendant filed a motion to sever what was then Count One of the Superceding Indictment from Count Two, at that time the felon-in-possession count. The Magistrate Court's Proposed Finding and Recommendation, which was later adopted by the District Court [Dkt. No. 82], recommended granting the motion to sever. The Magistrate Court found that "the undersigned can find nothing indicating that the stalking charge and the felon-in-possession charge are based on the same act or transaction or connected with or constitute parts of a common scheme or plan." Proposed Findings and Recommendations dated March 5, 2010 at 5 [Dkt. No. 55]. The Magistrate Court also noted that the Government had not charged Mr. Shrader with threatening the victims with the firearms, or that Mr. Shrader planned to use the firearms in furtherance of future stalking. *Id.* Moreover, the Magistrate Court found that "it is not enough that Defendant possessed the firearms when he sent the threatening letter as may be assumed from the Superceding Indictment . . . This constitutes a 'mere temporal relationship' between Defendant's possession of the firearms and sending of the letter." *Id.* Finally, the Magistrate Court also found that based on the testimony at the preliminary hearing, the firearms belonged to Mr. Shrader's elderly aunt who lived with him, and so therefore the firearms were at their residence for reasons unrelated to the stalking charges. *Id.* Nothing produced as evidence at either trial challenged these findings.

Mr. Shrader's adjusted offense level for his felon-in-possession conviction should therefore be

reduced from 33 to 16.[1]

**Paragraph 50**

If the base offense level on Counts One and Two is reduced to 18, and the base offense level on Count Three is reduced to 16, then the combined offense level under U.S.S.G. § 3D1.4 should be reduced by 10 levels. Mr. Shrader's total offense level should therefore be a 20 and not a 30.

The Guidelines advise that for offenses not listed under U.S.S.G. § 3D1.2(d), as those offenses that should (or should not) be grouped, then a "case-by-case determination must be made based on the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level." U.S.S.G. § 3D1.2(d). Offenses covered by § 2A6.2(b)(1)(D) are not covered by U.S.S.G. § 3D1.2(d). Counts One and Two should therefore be counted as one group as both offenses embody conduct that involves substantially the same harm and conduct. That is, because the same course of conduct alleged in the indictment pertained to both victims, then the two counts should be considered as one group.[2]

Because the base offense level for Counts One and Two are separated from the base offense level in Count Three by two levels (18 minus 16), then one Unit is added to the one Unit derived from grouping Counts One and Two. Two levels are then added to the base offense level for Counts One and Two, which results in a base offense level of 20 (18 plus 2).

**Paragraphs 51 & 54 –**

Mr. Shrader should not receive any criminal history points and should be placed in Criminal History Category I. The State of West Virginia discharged his sentence on the convictions listed in

---

[1] Two levels are added because the offense conduct on Count Three includes three firearms. U.S.S.G. § 2K2.1(b)(1)(A).

[2] Alternatively, should the Court agree that Mr. Shrader is liable for the specific offense characteristic under U.S.S.G. § 2A6.2(b)(1)(D), then § 3D1.2(c) would apply, since "the counts embod[y] conduct that is treated as a specific offense characteristic in . . . the guideline applicable to another of the counts."

paragraph 51 more than 15 years before the commencement of the offenses charged in the three-count indictment.  According to paragraph 53, the State released Mr. Shrader from imprisonment on December 23, 1993.  The interstate stalking counts commenced on or about October 26, 2009 as set forth in Counts One and Two of the Second Superceding Indictment, and the felon-in-possession-count alleged conduct took place on or about November 13, 2009, more than 15 years later.

**Paragraph 69 –**

Mr. Shrader's Total Offense Level should be a 20 and his Criminal History Category should be a I.  The resulting Guidelines imprisonment range should therefore be 33 to 41 months.

### III.     Victim Impact

**Paragraph 19 -**

Mr. Shrader respectfully requests that the Court deny DS and RS's counsel's request to obtain a copy of the PSR.  Mr. Butler states in his letter to the Probation Officer, referred to in paragraph 19 of the PSR, that he requires access to the draft PSR.  He is seeking access to the portion containing the recommended Guidelines calculation.  See Part III, page one, undated letter from Russell P. Butler, Esq.  The Court of Appeals for the Fourth Circuit has rejected the right of victims to obtain the PSR, including the portion sought by Mr. Butler. *United States v. Coxton*, 598 F. Supp. 2d 737, 738-741, (W.D. N.C. 2009)("The strong presumption against disclosure of the PSR to third parties is well represented in case law from both the United States Supreme Court and the Fourth Circuit.")(citing *In re Brock*, 262 Fed. App'x 510 (4th Cir. Jan. 31, 2008)).

Mr. Shrader also objects to Mr. Butler's request that (1) this Court attach to the PSR a copy of the letter that the jury found Mr. Shrader sent to DS; (2)  the Court consider and grant an upward departure under U.S.S.G. § 5K2.8; (3) the Court apply U.S.S.G. § 2A6.2(b)(1) to Mr. Shrader's Guidelines calculation; and (4) the request on behalf of DS and RS, that the Court recommend that Mr. Shrader be committed to  maximum security at FMC Butler.  The Crime Victims' Rights Act ("CVR

Act") explicitly states that victims have the right to be "reasonably heard at any public proceeding in the district court involving . . . sentencing. . . ." 18 U.S.C. § 3771(a)(4). DS and RS have the right to express their views, within reason, to the Court at Mr. Shrader's sentencing hearing. Mr. Butler does not, however, cite to any authority that confers the right under the CVR Act for victims' counsel to request the sentencing court to attach documents to the PSR or make requested Guidelines findings and recommendations for where the defendant should be housed by the Bureau of Prisons. Mr. Shrader also respectfully requests that a copy of Mr. Butler's letter not be filed along with the final version of the PSR as again, Mr. Butler cites no authority under the CVR Act, or any other source, conferring the right of victims to attach their attorney's sentencing advocacy letter to the PSR.

  **B.**  **Section 3553(a) Factors**

  **1.**  **Section 3553(a)(1): The nature and circumstances of the offense and the history and characteristics of the defendant.**

    **a.**  **Nature and Circumstances of the Offense**

Mr. Shrader respectfully disagrees with the guilty verdicts on all counts of the Second Superceding Indictment and asserts that the Government failed to prove beyond a reasonable doubt the elements of each offense listed in said indictment. Mr. Shrader intends, as is his right, to appeal his convictions following final judgment by this Court.

Mr. Shrader nevertheless asserts that the offense conduct in this case warrants a sentence of time served. As to the first two counts, Mr. Shrader respectfully requests that this Court consider the following:

First, there was no evidence presented at trial that Mr. Shrader had any plans or intentions of harming DS, RS and their family, or anyone else for that matter. When agents arrived at Mr. Shrader's home on November 12, 2009, they did not discover any evidence of any plan by him to travel to Texas to see DS and RS. No evidence has been found and presented by the Government to prove the Mr. Shrader meant any harm to, or had any plans to harm, DS and RS (or their family).

Second, according to the Government's evidence, Mr. Shrader sent a single letter to DS.  The Letter did not contain any direct threats of harm to DS and her family, a fact that is supported by the Government's decision to not charge Mr. Shrader with violating 18 U.S.C. § 876, mailing threatening communications.

Third, the Letter's meaning is at best ambiguous, with no direct threats of future harm.  The Letter is at times distasteful, grossly inappropriate and generally unpleasant to read.  The Letter, however, also contains statements that show that the author did not intend to harass or harm DS and RS and their family.  For example, at the top of page 29, the Letter states that a response to the Letter from an "outside response," "will receive a lawful and legal response."  The general tone and reason for the Letter is stated clearly on page 10: "I don't know what was really going on in your mind back then and still don't.  That's one thing I'm trying to find out now," and "[p]lus, I want to be honest and say what I have to say to you before forgetting everything and losing my mind with old age or dying before then."  The Letter also states on page 23 that Mr. Shrader never intends of getting in touch with DS again.  The Letter is therefore a misguided attempt to seek answers to what Mr. Shrader thinks are important questions from the only person who was a witness to the horrific crimes that happened in 1975, and, regardless of the futility of renewing a relationship 35 years later, to his former fiancee.

Fourth, we know from Mr. Shrader's recorded conversations with RS on August 6, 2008 that Mr. Shrader told him that he knew where DS and RS lived and yet had never contacted them in the past, a fact conceded by RS.   If Mr. Shrader had any intention of physically confronting DS and RS, why would he call them on the telephone or send a letter?

The Government presented evidence that Mr. Shrader made a series of phone calls on a single evening in August 2008.  Fourteen months later, with no contact (or otherwise attempted contact) in between, he sends DS the Letter.  That is all.  The Government sought to inflame the jury's anger and resentment towards Mr. Shrader by introducing testimony of actions that he allegedly took of which DS

and RS were unaware until disclosed by the Government, such as finding a satellite photo of their home on the internet, implying that he was planning to travel to their home. That charge is ridiculous. There is no law against finding out where other people live using the internet. The internet provides tools where practically anyone who has access to a computer can locate the whereabouts of another person. That Mr. Shrader may have located the home address of DS and RS using the internet is not a crime even though reasonable persons may disagree about what constitutes the proper use of internet technology. And the testimony about Mr. Shrader's interest in sending lingerie to DS and RS's daughter did not even amount to an attempt. See PSR ¶ 15. The fact remains that Mr. Shrader never acted upon this "idea," even if it were true. And even if he had, it would not have been a crime to send someone a package of underwear. Distasteful and repugnant? Yes. Illegal? No.

Fifth, RS gave DS the letter to read after Mr. Shrader was in custody and the FBI determined that there was no plan to harm DS and RS. By the time DS read the Letter, Mr. Shrader could not harm her even if he wanted to, which he did not.

Sixth, the unloaded firearms located in the residence shared by Mr. Shrader and his aunt had nothing whatsoever to do with sending the Letter. See discussion above, Part A, Paragraph II, page 5. There was no evidence that Mr. Shrader had any plans whatsoever to use these firearms (or any other firearm or dangerous weapon) against DS, RS and their family. The FBI did not locate and seize any ammunition in the residence. The was not a stitch of evidence that Mr. Shrader ever touched the firearms since he was convicted in 1976.

The victim impact statements show that DS and RS have lost their perspective on this matter as it is clear the victims are intent to keep Mr. Shrader in jail for the rest of his life, a sentence that is disproportionate to the facts. Please keep in mind, as defense counsel argued to the jury at the conclusion of the second trial, that reasonable persons may sympathize or even empathize with the concern expressed by RS when he first read the Letter that was meant for his wife. And it is more than

understandable that even hearing Mr. Shrader's name would cause DS great consternation. RS did what any responsible person would do if they harbored a concern that their loved one was in any danger, no matter how minuscule the threat, perceived or otherwise. But once the FBI arrested Mr. Shrader, and no evidence was discovered that he had any intention of traveling to Texas, then DS and RS's concerns should have dissipated.

But the victim impact statements reveal a mountain of anger and resentment from what happened in 1975. DS and RS have allowed that anger and resentment to fester to the point that their perspective has been lost. For example, DS states that Mr. Shrader should be incarcerated for life so that "he will not be able to harm or kill or terrorize again . . . I feel if it is not my family, it will be someone else's family." DS's Impact Statement at 1. Mr. Shrader has not harmed anyone since 1975. He led a crime free existence since he was released on parole. There is no evidence to suggest that Mr. Shrader would "harm or kill or terrorize" anyone. It is therefore difficult, if not impossible, to distinguish DS's negative feelings towards Mr. Shrader because of his sending the Letter as opposed to the murders he committed in 1975. RS's impact statement also expresses hyperbole and rank speculation. He writes that Mr. Shrader was caught before he completed his "plan." RS's Impact Statement at 1. There is no evidence of any "plan."

Mr. Shrader spent several minutes recording his thoughts following the August 6, 2008 telephone calls. Even in his own private words and thoughts there is nothing from these statements that suggests that he harbored any intent to harm DS and RS. Def's Exh. 5, Aug. 6, 2008 Telephone Call transcript, 22-27.

      b.      **History and Characteristics of the Defendant**

Mr. Shrader has led a tragic life. There is no question that he committed a terrible and senseless crime when he was 20 years old. It is understandable that few individuals would sympathize with the relatively sad and directionless life Mr. Shrader led since 1975. He never married or had children. He

never had a career since his release from imprisonment and now cannot work because of disabilities. The only family he ever knew or who cared for him began to pass away soon after he left prison. The only living relative that he is still close to is his aunt, Elizabeth Jones. She recorded a video letter for the Court's consideration, provided under separate cover. Ms. Jones describes in the letter a heartbreaking beginning for Mr. Shrader, born premature, without a father, nearly left for dead until Ms. Jones and her late husband and mother adopted him. Ms. Jones states that Mr. Shrader cared for his adoptive and biological mothers and her husband as they grew old and sick.

It is difficult to shed tears for someone who is a convicted murderer. But Mr. Shrader served his sentence for those murders a long time ago. He is still human and it is surely a human instinct to want to reach out to others for compassion. It is neither surprising nor unusual that DS and RS have no sympathy for Mr. Shrader. But the reaction of Mr. Shrader to RS's compassion that is, Mr. Shrader's tearful response to what appeared to be RS's genuine and sincere attempt at reconciliation during the phone calls on August 6, 2008 shows Mr. Shrader's innate humanity. See Def's Exh. 5, Aug. 6, 2008 Telephone Call tr., 21:17-24.

The misguided letter sent 14 months later is seen by DS and RS in its worst light, which again is understandable. And yet Mr. Shrader's loving care for his dying relatives and his ongoing concern for his aging aunt, who needs him more than ever as she gets older and more frail, must also be considered when determining the appropriate punishment.

Mr. Shrader is 56 years old. He suffers from a number of ailments. See PSR ¶ 58. He served 18 years in prison for the very serious crimes he committed in 1975 and 1976. This sentencing should not be, as DS and RS request in their victim impact statements, an opportunity to undo the State of West Virginia's decision to parole Mr. Shrader in 1993. The fact is, Mr. Shrader has lived a law abiding life since 1993, but for the offenses of conviction. Notwithstanding Mr. Shrader's objection to the jury's verdicts, his lapse in judgment in sending the letter last October was just that, a single mistake that

should not translate into what would amount to a life sentence if DS and RS's requests are granted.

The Court has at its disposal the ability to place Mr. Shrader on supervised release for 3 years (assuming the Court does not find that Mr. Shrader applies for ACCA status), and hold over his head additional imprisonment should he incur any violation, which would certainly include a requirement that Mr. Shrader have no contact whatsoever with DS, RS and their family. The year that he has spent in prison, plus three years of restricted and supervised freedom, is a sentence that is sufficient but not greater than necessary to carry out the purposes of sentencing under 18 U.S.C. § 3553(a) given the offense conduct in this case.

> **2.    Section 3553(a)(2)(A-C): The need for the sentence imposed to reflect the seriousness of the offense; to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant.**

The requested sentence of time-served, which will amount to a sentence of just over one year, along with three years of supervised release, is an adequate sentence that will reflect the seriousness of the offense, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant.

> **3.    Section 3553(a)(2)(D): The need for the sentence to be imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Mr. Shrader respectfully requests that if he is to serve additional time in prison that the Bureau of Prisons provide the necessary medical care he requires.

> **4.    Section 3553(a)(3-4): The kinds of sentences available and the kinds of sentence and the sentencing range established by the Guidelines.**

Mr. Shrader reiterates his objections set forth above to the Probation Officer's Guidelines calculations.

> **5.    Section 3553(a)(5): Pertinent Policy Statements.**

Under U.S.S.G. § 5H1.1, the defendant's age may be relevant in determining whether a departure

is warranted. In the post-*Booker* era, a defendant's age may be considered by a court when deciding whether a variance is appropriate. *Gall v. United States*, 552 U.S. 38, 57 (2007)(the Court noted with favor that the district court gave significant weight to the fact that Gall committed the offense at age 21, likening Gall's conduct to the "impetuous and ill-considered" actions of persons under the age of 18). The Sentencing Commission has noted through its research that "[r]ecidivism rates decline relatively consistently as age increases." U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines ("Measuring Recidivism"), May 2004, at 12, http://www.ussc.gov/publicat/ Recidivism_General.pdf. The Introductory Commentary to Part A, Criminal History states that for policy reasons age was not considered a factor in determining a defendant's criminal history at the time the Guidelines were created. U.S.S.G. Ch. 4, Pt. A, intro. Nevertheless, the Commission states that the Guidelines leave open the possibility that in the future age may be a factor. See Measuring Recidivism, at 16 n.32.

As argued above, Mr. Shrader's relatively old age is a factor that this Court may and should consider in support of the downward variance requested. Moreover, in the post-*Booker* era, this Court may also consider Mr. Shrader's family ties and responsibilities, namely his need to assist to his elderly aunt with whom he resides, as a reason to vary downward.

6. **Section 3553(a)(2)(A): The need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct.**

This Court may avoid sentencing disparity among only those few defendants who come before it for sentencing. Prosecutorial decisions differ between jurisdictions and at each step of the process create sentencing disparity between similar defendants who engage in similar offense conduct. These decisions, including the Government's use of its ability to file substantial assistance and Rule 35 motions, create a great deal of disparity in the sentencing of offenders. Thus, the claim of sentencing uniformity is, at best, limited to a segment of federal prosecutions.

7. **Section 3553(a)(7): The need to provide restitution to any victim of the offense.**

Mr. Shrader objects to the imposition of any restitution for DS's counseling sessions unless and until he and his defense counsel have the opportunity to review said records referred to in paragraphs 19 and 79 of the PSR. Mr. Shrader has filed a motion today under F.R.Cr.P. 17(c)(3) requesting those records to confirm the nature of the counseling sought and received by DS to determine their relevance to the issues in the case at bar.

C. **Witnesses to be Called for 18 U.S.C. §3553(a) Factors**

Mr. Shrader does not intend to call any witnesses at his sentencing hearing.

D. **Estimate of Time Needed for the Sentencing Hearing**

Defense counsel estimates that the length of the sentencing hearing will depend on how the Court wishes to resolve the matter addressed in this memorandum and the length of the victims' testimony.

Respectfully submitted this 9th day of November, 2010.

                                                **THOMAS CREIGHTON SHRADER**
                                                By Counsel

**MARY LOU NEWBERGER**
**FEDERAL PUBLIC DEFENDER**

s/Christian M. Capece
Christian M. Capece, WV Bar No. 10717
Assistant Federal Public Defender
3400 U. S. Courthouse
300 Virginia Street East
Charleston, WV 25301
Telephone: 304-347-3350; Fax: 304-347-3356
E-mail: christian_capece@fd.org

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION

UNITED STATES OF AMERICA

v.  Criminal Action No. 1:09-00270

THOMAS CREIGHTON SHRADER

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **"DEFENDANT'S SENTENCING MEMORANDUM"** has been electronically filed with the Clerk of Court this date using the CM/ECF system and served upon interested party and opposing counsel as follows:

**VIA CM/ECF:** Thomas C. Ryan
Assistant United States Attorney
Room 4000, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: thomas.ryan@usdoj.gov

**DATE:** November 9, 2010

s/Christian M. Capece
Christian M. Capece, WV Bar. No. 10717
Assistant Federal Public Defender
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
Email: christian_capece@fd.org